UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
THOMAS G. TUCKER,

                Plaintiff,

       - against -

THE CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF HEALTH AND MENTAL HYGIENE,
DR. ROBERT HOFFMAN, MARIA ZAMPELLA, and
THOMAS R. FRIEDEN,

                Defendants.
----------------------------------------X

**M E M O R A N D U M
A N D
O R D E R**

07 Civ. 10367(NRB)

**NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE**


    Plaintiff Thomas Tucker, formerly an employee of the New York City Department of Health and Mental Hygiene ("DOHMH"), brought this action against defendants the City of New York, the DOHMH, Dr. Robert Hoffman, Maria Mercurio-Zapalla (incorrectly captioned as "Maria Zampella"), and Thomas R. Frieden, pursuant to the First Amendment; 42 U.S.C. § 1983; New York State Labor Law § 740; New York Civil Service Law § 75-b; New York Human Rights Law, N.Y. Exec. Law § 296 *et seq.*; the New York City Whistleblower Law, N.Y.C. Admin. Code § 12-113; and the New York City Human Rights Law, N.Y.C. Admin. Code §8-502(a) *et seq.* Plaintiff alleges that he was terminated in retaliation for complaining about corruption, complaining about unsafe and unsanitary working conditions, and seeking accommodation for his disability. Now before the Court is defendants' motion for

summary judgment. For the reasons discussed below, summary judgment is granted to defendants on the retaliation claim and the Court declines to exercise jurisdiction over the remaining state and city law claims.

## BACKGROUND

From November 2005 until September 20, 2007, Tucker was employed as a Poison Control Information Specialist ("PCIS") at the New York City Poison Control Center ("NYPCC"), a facility operated by DOHMH. Dr. Thomas Frieden was the New York City Health Commissioner and the head of DOHMH during this period; Dr. Robert Hoffman was the Director of the NYPCC; and Maria Mercurio-Zapalla was the Managing Director of the NYPCC and Tucker's direct supervisor. Ms. Zapalla was not employed by DOHMH, but instead through Bellevue Hospital, which is a part of the New York City Health and Hospitals Corporation ("HHC"), a public benefit corporation created by the State of New York.

Tucker's duties included answering telephone calls to an emergency hotline from consumers or health care practitioners regarding overdoses and accidental ingestion of poisons and making recommendations for treatment, often in consultation with toxicologists who were his co-workers at NYPCC. (Tucker Dep. Ex. A 16:13-16; 17:20-18:1; 18:21-19:6.) As a PCIS, he was a member of a labor union, SEIU 1199. (*Id.* at 20:20-25.)

Tucker was qualified for his position in virtue of having been trained and licensed as a pharmacist. (*Id.* at 10:1-11.) He had previously operated his own pharmacy in Staten Island for a number of years. (*Id.* at 9:6-14.) However, Tucker sold his pharmacy business in 1998, after a back injury he suffered in a car accident left him unable to sit or stand for long periods of time. (*Id.* at 13:12-17) Prior to obtaining employment with NYPCC, Tucker was receiving Social Security disability payments in connection with his back injury. In 2005, he voluntarily chose to seek employment at NYPCC despite his injury, utilizing the Social Security Administration's "Ticket to Work" program. (*Id.* at 14:17-23.)

Tucker never received a written performance evaluation during the 22 months he worked at NYPCC. In addition, no formal disciplinary actions were taken against him. Tucker was commended in an August 2006 memorandum entitled "Catch of the Month," for his role in responding to a carbon monoxide case. (Canfield Decl. Ex. H 18.)[1] However, a March 19, 2007 memorandum

---

[1] This is presumably the incident Tucker refers to when he states that he "received a formal award from Defendant Hoffman, which award I received after I saved an entire building of people from fatal carbon monoxide poisoning." (Tucker Decl. ¶ 16.) It is unclear whether the memorandum itself is what Tucker refers to as a formal award, or whether some other means of recognizing his achievement was presented to him, as neither party has submitted a copy of the document in question.

from Zappala to Tucker[2] states that, on March 14, 2007, Tucker failed to advise his supervisors that he had arrived prior to the start of his scheduled shift and begun work early, and had unnecessarily remained at work past the end of his shift, thereby earning an additional hour of compensatory time which "didn't benefit the poison center." (*Id.* at Ex. G.) The memorandum also states that Tucker may no longer earn compensatory time without the notification and approval of his supervisors. (*Id.*) Tucker maintains that he "consistently worked overtime, but only when requested by a supervisor." (Tucker Decl. ¶ 15.) He acknowledges having been instructed not to deviate from his scheduled shifts in an email, but insists that this instruction was later withdrawn by Zappala, who told Tucker to disregard it. (Tucker Dep. Ex. A 50:3-19.)

While at NYPCC, Tucker complained to his supervisors and to his union about the presence of water bugs, roaches, and rodents in the workplace. (*Id.* at 21:17-23.) In addition, Tucker complained to his supervisors and to his union that the chairs at NYPCC were broken and causing him back pain, that he was not

---

[2] Tucker denies receiving this memorandum (Pl.'s Rule 56.1 Statement ¶ 13.), and the copy submitted to the Court by defendants is not signed. (Canfield Decl. Ex. G.) In addition, plaintiff's counsel states that the memorandum was not produced by defendants during discovery, (Pl.'s Mem. Opp. 16.), but has not moved to strike this document.

given alternative work breaks, and that the scheduling of shifts was unfair to newer employees. (*Id.* at 23:24; 28:4-29:6.)

In response to Tucker's complaint about pests, Zapalla had an exterminator come in to set food traps. (*Id.* at 24:21; 27:20-24.) Zapalla also attempted to replace the broken chairs. However, when replacement chairs arrived, they were deemed to be no better than the old ones and Zapalla sent them back. (*Id.* at 29:4-6; 30:14-24.) Finally, Dr. Hoffman held a meeting for the employees to discuss the scheduling issues raised by Tucker. (*Id.* at 34:15-25.)

On September 10, 2007, Tucker was working a day shift at NYPCC. It was the last shift Tucker was assigned to work before taking a scheduled vacation until September 20. During the shift, Tucker had a disagreement with a toxicologist who did something that bothered him. (Pl.'s Rule 56.1 Statement ¶ 15.) Following his interaction with the toxicologist, Tucker approached Zapalla and asked for permission to leave work early due to back pain. The issue of whether Zapalla gave Tucker permission to leave is disputed. Tucker testified as follows:

> Q: What did Ms. Zampella [sic] say in response to your request to leave early that day?
> A: Initially when I asked her, she appeared to nod that it was okay.
> Q: So did you leave that day early?
> A: Yes.

> Q: So Ms. Zampella [sic] granted your request that you be permitted to leave early on September 10?
> A: Not really.
> Q: You just testified that she nodded and you went home early that day, correct?
> A: Yes.
> Q: So she did approve or didn't approve or something else?
> A: She appeared to approve but then she began to say things.
> (Tucker Dep. Ex. A 51:25-52:15.)

Tucker then returned to his desk and began packing his belongings in order to depart. Zapalla asked Tucker if he could try to make it through the day, and observed that Tucker had not mentioned his back pain that morning when the shift began. (*Id.* at 52:17-53:3.) Tucker replied that his disability caused his back to hurt every day but this day was worse than others, that he was also frustrated with "broken chairs, short staffed, no alternative work break, the mice and roaches," and that he was going to report all of these problems to the Department of Investigation ("DOI").[3] (*Id.* at 53:5-10.)

In his affidavit, Tucker asserts that at this time he also informed Zapalla he would report "her and my other superiors to DOI" for "her and others' illegal and fraudulent practices."

---

[3] Tucker's affidavit and both parties' briefs refer generally to the DOI, although the investigators who conducted interviews and created the report attached as Exhibit H to the Canfield Declaration appear to have been from the DOHMH Inspector General's ("IG's") Office. As nothing of importance turns on the distinction between DOI and the DOHMH IG in what follows, we refer to the latter in discussing Tucker's actions and the subsequent investigation. Zapalla also appears to have believed Tucker was referring to the IG's office, *see infra*, and later testified that she did not know what the IG's office was at the time. (Canfield Decl. Ex. H 93:15-94:6.)

(Tucker Decl. ¶ 29.) At 4:20pm, Zapalla wrote the following in an email to the Deputy Director of the DOHMH Employee Law Unit:

> As per our discussion this afternoon, I am describing the incident that occurred at NYC Poison Control Center. Tom Tucker was one of two specialists scheduled to work today. He was upset this morning regarding a possible salary increase and spent a significant portion of his morning discussing this on 2 separate episodes with myself and Dr. Hoffman. He was also due to go on vacation after his shift today. This afternoon, he had an interaction with one of the physicians here (she relayed the issue to me) and he stormed in my office and stated that his back was bothering him and that he was leaving for the day. Then he stated that he was ADA and that he would not come back in the office until his MD said it was ok, and we should see "what it would be like to be without him for a few weeks." He was very agitated and controlling his anger, which made me very nervous and hesitant to approach him immediately. He then stated that the working conditions in this office are unacceptable and that there was "a lot going on here" and he was going to the IG office to report us.
> (Canfield Decl. Ex. I.)

Tucker left work at approximately 2:30pm and did in fact meet with investigators from the IG's office at 4:30pm on the same day. (Canfield Decl. Ex. H 3.) Tucker then went on his scheduled vacation the following day.

Between September 10 and 20, 2007, there were several meetings between Zapalla, Hoffman, and two other DOHMH officials to discuss whether Tucker should be terminated. When Tucker returned to work on September 20, 2007, Hoffman gave him a

letter terminating his employment effective immediately. (Tucker Decl. ¶ 35.)

Tucker's firing prompted the IG's office to investigate a possible violation of the Whistleblower Law based on Tucker's allegations that: (1) Hoffman and Zapalla might be engaged in an inappropriate relationship; (2) Zappala was seldom present at work, and Hoffman "covers" for her; (3) grant money allocated from Bellevue Hospital (HHC) to DOHMH PCC to hire personnel was misused; (4) unlike PCC PCIS's employed by DOHMH, PCC PCIS's employed by HHC received no differential benefits and/or holidays, and PCC supervisors make up for the discrepancy by adding hours that are not worked on their timesheets; and (5) the chairs at the PCC had "ergonomic problems." (Canfield Decl. Ex. H 3.) A report of the investigation concluded that Tucker was not fired for his complaints, but for his disruptive conduct including "displays of anger" which may have caused others to feel "threatened and intimidated." (*Id.* at 20.) The report reasoned that the timeline of events did not support a claim for retaliation based on Tucker's conversation with investigators. (*Id.* at 20.)

## DISCUSSION

## I. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986); *see also Quarles v. Gen. Motors Corp.,* 758 F.2d 839, 840 (2d Cir. 1985). Material facts are those which "might affect the outcome of the suit under the governing law . . . [f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether a genuine issue of material fact exists, a court must view the facts in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. *See Fincher v. Depository Trust & Clearing Corp.,* 604 F.3d 712, 720 (2d Cir. 2010).

## II. First Amendment Claim

The First Amendment prohibits a public employer from retaliating against an employee for engaging in protected speech. *See Connick v. Myers*, 461 U.S. 138 (1983); *Perry v.*

*Sindermann*, 408 U.S. 593 (1972); *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). However, "while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance'." *Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006) (quoting *Connick*, 461 U.S. at 154). Thus, when an employee speaks "as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick*, 461 U.S. at 147.

To have a viable claim, a public employee must first establish that his speech was protected by the First Amendment. *See Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008). Determining whether or not public employee speech is protected entails two inquiries: (1) whether the employee spoke as a citizen on a matter of public concern, and if so, (2) whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. *Garcetti*, 547 U.S. at 418; *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008).

If a public employee's speech was protected, then the employee may state a First Amendment retaliation claim provided

-10-

that: the employee suffered an adverse employment action, and there was a causal connection between the protected speech and the adverse employment action. *See Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006). However, "the defendant can still prevail on a motion for summary judgment if it can show that it would have taken the same adverse employment action 'even in the absence of the protected conduct'." *Cotarelo v. Sleepy Hollow Police Dep't*, 460 F.3d 247, 251-52 (2d Cir. 2006) (quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

## A. Protected Speech

To determine whether Tucker's speech was protected, we turn to the first inquiry: whether Tucker's statements were made as a citizen on matters of public concern. The Supreme Court has stated that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. The speaker's motivation, although relevant, is not dispositive. *See Sousa v. Roque*, 578 F.3d 164, 173-74 (2d Cir. 2009) ("An employee who complains solely about his own dissatisfaction with the conditions of his own employment is speaking upon matters only of personal interest . . . however, [] it does not follow that a person motivated by a

personal grievance cannot be speaking on a matter of public concern.").

With these principles in mind, it is evident that many of Tucker's complaints were merely personal matters related to his employment and not matters of public concern. Despite plaintiff's efforts to characterize the presence of waterbugs, roaches, and rodents as a "public health" issue affecting "the health and safety of his coworkers," (Pl.'s Mem. Opp. 8, 6.), we find that these claims do not rise above the level of personal dissatisfaction with the conditions of Tucker's office. There can be no meaningful allegation that an office infestation poses a serious threat to public health, nor that the pests at NYPCC interfered with the ability of employees to assist callers with poison control emergencies. We will not allow the plaintiff to "convert what were essentially internal office affairs into matters of public concern through a revisionist interpretation of his complaints that draws on the incidental connection between events that transpire within a government office and public issues." *Benvenisti v. City of New York*, 2006 U.S. Dist LEXIS 73373 *34 (S.D.N.Y. Sep. 23, 2006). In addition, it is clear that Tucker's supervisor was equally concerned about the presence of waterbugs, roaches, and rodents and that she

attempted to remedy the problem by bringing in an exterminator on two occasions. (Tucker Dep. Ex. A 29:14-16.)

Tucker's complaints about scheduling and the lack of alternative work breaks involve similarly narrow issues of concern only to himself and certain other employees, not the general public. Specifically, Tucker complained that newer employees were required to work more overnight shifts than senior employees (Tucker Dep. Ex. A 31:23-32:14.), and that employees were not given breaks in accordance with a training video Tucker had viewed. (*Id.* at 22:1-12 ("[I]f you worked on a computer, every so much period of time, you are not supposed to be working on a computer anymore but do something else. In other words you would be do [sic] phone calls as an alternative work break. It said we were supposed to get an alternative work break in the video, but we never did.").) Tucker offers no theory as to how these complaints could be understood as anything other than ordinary employee grievances, nor in what sense the public could possibly be concerned about his work schedule or the frequency of his breaks. Likewise, Tucker's complaints about broken chairs are specific to him and do not implicate his First Amendment right to free speech. Although Tucker's supervisor attempted to replace the chairs Tucker complained about, only to be told that the new chairs were also unsatisfactory, the

-13-

adequacy of this response to his complaints is simply not the issue. "The First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Connick*, 461 U.S. at 149.

By contrast, the allegations of corruption and misuse of public funds by Tucker's supervisors and coworkers were clearly matters of public concern. *See Hoyt v. Andreucci*, 433 F.3d 320, 330 (2d Cir. 2006) ("We view concerns raised to the government about the lawfulness of public officals' actions as implicating a matter of public interest . . ."); *see also Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 606 (1976) (Brennan, J., concurring) ("[C]ommentary on the fact that there is strong evidence implicating a government official in criminal activity goes to the very core of matters of public concern."). Specifically, Tucker made the following allegations when he spoke to investigators from the IG's office: that Zapalla was overstating the hours worked by another employee to make up for perceived inequities in pay, that Zapalla herself was claiming to have worked hours when she was not present at the NYPCC, and that Dr. Hoffman was knowingly authorizing these actions.

Defendants argue that, even assuming that the fraud or corruption of DOHMH officials are matters of public concern, Tucker did not raise these issues as a private citizen, but

-14-

pursuant to his official duties. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421.

Although it was not part of Tucker's job description as a PCIS to ferret out misuse of public funds, defendants find support for their argument in a recent Second Circuit case, *Weintraub v. Board of Education*, 593 F.3d 196 (2d Cir. 2010). In *Weintraub* a public school teacher had filed a grievance with his union about the failure of his supervisor to discipline a student who threw a book at him. The Second Circuit held that "speech can be 'pursuant to' a public employee's official duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer." *Id.* at 203. Thus Weintraub's grievance was held to be pursuant to his official duties because it was "part-and-parcel of his concerns about his ability to properly execute his duties as a public school teacher--namely, to maintain classroom discipline." *Id.* at 201 (internal citation and quotation omitted).

We do not find Tucker's complaints about the misuse of public funds to be analogous to a teacher's complaint about

-15-

discipline in the classroom. None of Zapalla's allegedly fraudulent actions with respect to her own or another worker's timecards had any bearing on Tucker's ability to carry out his job as a PCIS. Thus, under *Weintraub*, Tucker's allegations about financial improprieties were not "part and parcel" of any concern he had about his official duties.[4] We conclude that, although he may have been motivated in part by other frustrations at work, Tucker made his statements to investigators as a private citizen concerned about "the misallocation of taxpayer funds." (Pl.'s Mem. Opp. 6.)

The second inquiry concerns whether the government entity had adequate justification for restricting the employee's speech differently from that of other members of the general public. *Garcetti*, 547 U.S. at 418 (citing *Pickering*, 391 U.S. at 568). This requires balancing the employee's First Amendment interest against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its

---

[4] Defendants also argue, for the first time in the reply brief, that the Mayor's Executive Order No. 16, issued in 1978, affirmatively obligates all city employees to report corruption, criminal activity, or conflicts of interest. They assert that this order establishes Tucker's official duty as a city employee to report the activities of his supervisor which he believed to be illegal, and thus deprives him of First Amendment protection for whistleblowing. Accepting the defendants' broad theory of the scope of a city employee's duties would effectively curtail all city employees' rights to speak out about corruption, thereby discouraging whistleblower activity that is of great benefit to civil society. Because the Supreme Court has specifically rejected the notion "that employers can restrict employees' rights by creating excessively broad job descriptions," *Garcetti*, 547 U.S. at 424, we find defendants' reliance on Executive Order No. 16 to be misplaced.

employees." *Pickering*, 391 U.S. at 568. Defendants do not argue that Tucker's statements to the IG's office interfered with the DOHMH's ability to provide efficient poison control services so as to outweigh the value of his speech. Thus we accept, for the purposes of this motion, that Tucker's statements about misuse of public funds were protected speech under *Garcetti*.[5]

## B. Retaliation

Defendants seek summary judgment on the ground that Tucker was not terminated in retaliation for any protected speech. They contend that Tucker has failed to allege any facts from which a jury could infer a causal link between his statements to the IG's office and his termination by DOHMH ten days later. In addition, defendants argue that Tucker would have been terminated for legitimate reasons even in the absence of any protected speech.

A plaintiff must establish a causal link "sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have

---

[5] We do not mean to condone an employee's leaving work early under false pretenses in order to speak to investigators, and we recognize that reasonable time, place, and manner restrictions, if any had been imposed by Tucker's employer, could have properly prevented him from doing so. *See Givhan v. Western Line Consolidated School District*, 439 U. S. 410, 415 n.4 (1979) (recognizing that in some circumstances "the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it is delivered.")

been taken absent the employee's protected speech." *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) (citing *Mt. Healthy City*, 429 U.S. at 287). Ordinarily, indirect causation is shown when an employee's speech was closely followed in time by an adverse employment decision. *See Cioffi*, 444 F.3d at 168. Logically, however, no such inference can be drawn where the employee's protected speech was not made publicly and was not made known to anyone within the employer. Speech of which an employer and its agents are completely unaware cannot possibly be a motivating factor in that employer's decision to terminate an employee.[6]

Plaintiff attempts to establish causation indirectly by arguing that his termination occurred only ten days after he threatened to complain "to DOI" about "illegal and fraudulent practices." (Tucker Decl. ¶ 29.) However, there is a discrepancy between the version of events in Tucker's affidavit, which states that he informed Zapalla that he would report her alleged

---

[6] We note that the Second Circuit does not require individual knowledge on the part of those responsible for carrying out the adverse action, but merely general corporate knowledge. *See Papelino v. Albany College of Pharm. of Union Univ.*, 633 F.3d 81, 92 (2d Cir. 2011); *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 148 (2d Cir. 2010); *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000) (rejecting "the argument that in order to satisfy the causation requirement, a plaintiff must show that the particular individuals who carried out an adverse action knew of the protected activity). However, it remains the case that *someone* within the corporate hierarchy of the employer must have the requisite knowledge in order for causation to be possible. *See Gordon*, 232 F.3d at 117 (allowing that a causal connection may be found only where "the circumstances evidence knowledge of the protected activities or . . . an agent is acting explicitly or implicit[ly] upon the orders of a superior who has the requisite knowledge.")

fraud to DOI (*Id.*), and his deposition testimony, in which he refers only to "broken chairs, short staffed, no alternative work break, the mice and roaches." (Tucker Dep. Ex. A 53:7-9.)

A party is not permitted to "create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614 (2d Cir. 1996). The insertion of a reference to the sole instance of protected speech engaged in by Tucker contradicts his prior testimony about the statements he made in conversation with Zapalla, none of which involved matters of public concern. However, the email message sent by Zapalla shortly after that conversation reveals that Tucker did express to her a future intention to make a report to the IG's office about "a lot going on here." (Canfield Decl. Ex. I.) Plaintiff appears to assume that this vague phrase in Zapalla's email message must be understood as a reference to her own alleged financial improprieties, despite the obvious fact that a person involved in illegal or fraudulent activity would never make such a reference in an email to the Employee Law Unit and her superiors.[7]

---

[7] In the same email, Zapalla recounts Tucker threatening not to return from vacation until he received his doctor's approval, in order to let his employer see "what it would be like to be without him for a few weeks."

-19-

Nonetheless, even assuming that Tucker conveyed his future intention to speak about Zapalla's misconduct, there is nothing in the record to suggest that Zapalla, the email recipients, or anyone else at DOHMH actually learned, prior to their decision to terminate Tucker, that he did in fact proceed to make any statements to investigators from the IG's office, including statements protected by the First Amendment. While the facts must be viewed in the light most favorable to plaintiff, the issue here is not whether plaintiff actually complained to the IG's office, but whether defendants knew of his doing so before they decided to terminate him. Even if his supervisor had understood him to be threatening to engage in protected speech, it does not follow that she also knew that he carried out this threat. The mere threat to speak out is not equivalent to actually doing so, as every blackmailer (and blackmailee) unfortunately knows.

We now turn to defendant's second response to plaintiff's claim of retaliation, namely that plaintiff would have been terminated even in the absence of any protected speech. Plaintiff has offered nothing other than conclusory denials to rebut defendants' evidence that, on September 10, 2007, he lost

---

(Canfield Decl. Ex. I.) This further confirms that the phrase "a lot going on here" was understood as a reference to Tucker's personal dissatisfactions and not illegality.

his temper with a co-worker, argued angrily with his supervisor, and left work early one day prior to his scheduled vacation without receiving any clear indication that he was permitted to do so. (Canfield Decl. H 6-8; 11-12; 15.) Between September 10 and 20, 2007, Zapalla, Hoffman, and two other DOHMH officials had a series of meetings in which they discussed plaintiff's behavior and ultimately reached the decision to terminate him. (*Id.* at 12.) The subsequent investigation by the IG's office concluded, on the basis of numerous interviews, that Tucker was terminated because of his poor personal conduct on the job, which included "displays of anger," making others feel "threatened and intimidated," "announc[ing] he had found a new job and would be leaving soon," and "yell[ing] and/or speak[ing] in a loud and angry voice while pacing about." (*Id.* at 20.) In addition, there is evidence that plaintiff's supervisors believed that Tucker was responsible for "an environment where people did not feel safe at their job, and where people did not respect their supervisors." (*Id.* at 12.) Nothing in the investigation report or any of plaintiff's submissions suggests that anyone at plaintiff's employer was aware, prior to his termination on September 20, 2007, that he had actually spoken with investigators from the IG's office only ten days earlier.

In summary, absent any evidence of a causal link between his protected speech to investigators and his termination by DOHMH superiors, plaintiff has failed to establish an element of his First Amendment retaliation claim. Defendants and their agents simply did not know about his protected speech at the time he was terminated. In addition, defendants have provided legitimate reasons for their decision to terminate plaintiff, demonstrating that they would have taken the same action even in the absence of his protected speech. *See Cotarelo*, 460 F.3d at 251-52. For these reasons, defendants' motion for summary judgment on the First Amendment retaliation claim is granted.[8]

## III. State and City Law Claims

Plaintiff's remaining claims are brought under New York State Labor Law § 740; New York Civil Service Law § 75-b; New York Human Rights Law, N.Y. Exec. Law § 296 *et seq.*; the New York City Whistleblower Law, N.Y.C. Admin. Code § 12-113; and the New York City Human Rights Law, N.Y.C. Admin. Code §8-502(a) *et seq.* Because we have granted summary judgment to defendants on plaintiff's sole federal claim, we decline to exercise supplemental jurisdiction over the remaining state and city law

---

[8] Because plaintiff's First Amendment retaliation claim fails, the claim for municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), fails as well. *See, e.g., Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under Monell was entirely correct.").

claims. 28 U.S.C. § 1367(c)(3); *see Astra Media Group, LLC v. Clear Channel Taxi Media, LLC*, 2011 U.S. App. LEXIS 2949 *7 (2d Cir. Feb. 15, 2011) ("[W]e have generally held that where all the federal claims have been dismissed at a relatively early stage, the district court should decline to exercise supplemental jurisdiction over pendent state-law claims.").

### CONCLUSION

For the reasons set forth above, plaintiff's complaint is dismissed in its entirety.

**SO ORDERED.**

Dated:    New York, New York
          July 15, 2011

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

-23-

Copies of the foregoing Order have been mailed on this date to the following:

Plaintiff's Counsel
Walker G. Harman, Jr.
THE HARMAN FIRM, PC
200 West 57th Street, Suite 900
New York, NY 10019


Defendants' Counsel
Donna A. Canfield
Assistant Corporation Counsel
Corporation Counsel of the City of New York
100 Church Street, Room 2-124
New York, NY 10007